# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| SHIRLEY D. DEAN, | ) Case No.: 2:07-CV-496 |
| | ) |
| Plaintiff, | ) **CITY OF MONTOMERY'S BRIEF IN** |
| | ) **SUPPORT OF MOTION FOR SUMMARY** |
| vs. | ) **JUDGMENT** |
| | ) |
| CITY OF MONTGOMERY, | ) |
| | ) |
| Defendant | ) |

COMES NOW the City of Montgomery, by and through undersigned counsel, and in support of its Motion for Summary Judgment, says as follows:

## PROCEDURAL HISTORY

Plaintiff filed the Complaint and Amended Complaint in this case alleging sexual harassment, racial disparate treatment, sex-based disparate treatment, and retaliation under Title VII of the Civil Rights Act of 1964.  While Plaintiff invokes jurisdiction under 42 U.S.C. §§1981 and 1983, no specific allegation is made for the violation of these statutes.  The Amended Complaint, therefore, appears to allege that the conduct complained of and actionable under 42 U.S.C. §2000 et. seq. is actionable under 42 U.S.C. §§1981 and 1983 for the same reasons.

## FACTS

Shirley Dean was hired by the City of Montgomery on October 26, 2001, and continued in her employment as a correctional officer at the Montgomery Municipal Jail until her termination on January 23, 2007.  (Exhibit A, Brantley Affidavit).  On December 27, 2005 Shirley Dean was touched inappropriately by a male co-worker: Mr. Calvin Knight.  While the substance of the report is disputed, Dean made a verbal report of the incident to her supervisor,

Ms. Hopkins on that same day.  (Exhibit B, Hopkins Affidavit).  Dean also reported the conduct to the Assistant Warden, Ms. Brantley, on December 28, 2005.  (Exhibit A, Brantley Affidavit).

On January 9, 2006, Plaintiff was given a Counseling Report Form by her supervisor, Ms. Hopkins, counseling her for failing to report for scheduled duty without proper authorization on December 18 and 20, 2005 as required by Rule 2.212 of the Montgomery Police Department Rules and Regulations. (Exhibit C, Counseling Report Form).

On June 26, 2006, Plaintiff filed an EEOC charge alleging sexual harassment and retaliation. (Exhibit D, 6/26/06 EEOC Charge of Discrimination).  On July 9, 2006, Plaintiff was suspended for twenty days for failing to report an on-the-job injury which occurred on March 7, 2006, and which she reported on March 13, 2006.  The recommendation for the twenty-day suspension was made on April 25, 2006.  (Exhibit E, Recommendation for Suspension).

On July 13, 2006, Plaintiff was moved from second shift to third shift.  She filed a second EEOC charge alleging the move to be retaliation on July 24, 2007.  (Exhibit F, 7/24/06 EEOC Charge of Discrimination)

Plaintiff was terminated from her employment on January 23, 2007 for refusing a direct order to answer questions during an internal affairs investigation, her previous record having been considered, in accordance with the City of Montgomery's progressive disciplinary policy. (Exhibit G, Notice of Dismissal).  Plaintiff filed an EEOC charge regarding her termination on December 26, 2007, the recommendation for termination having been made prior to that time.

## ARGUMENT

### I.    42 U.S.C. §1981 and §1983

It is unclear which federally guaranteed right the plaintiff alleges has been violated in her §1983 claim if it is not the right to equal protection set out in 41 U.S.C. §1981.  Since the

Eleventh Circuit has found that §1981 does not create a right of action against state actors, the claim can only be read to mean that the plaintiff is using §1983 as a vehicle to enforce the substantive rights guaranteed by §1981. Butts v. County of Volusia, 222 F.3d 891, 894 (11th Cir. 2000). The claim, then, appears to be one brought under 42 U.S.C. §1983.

The law is clear that a municipality cannot be held liable under §1983 unless the damage complained of was caused by a custom or policy of the municipality. Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 663, 98 S.Ct. 2018, 2022, 56 L.Ed.2d 611 (1978). The plaintiff in this case has failed to allege that a custom or policy of the City of Montgomery caused the alleged violation, either directly, or through the actions of anybody with "final policy making authority." Hill v. Clifton, 74 F.3d 1150 (11th Cir.1996) ("Only those officials who have final policymaking authority may render the municipality liable under §1983."). The claim brought under §1983 and §1981, therefore, fails to create an issue of material fact to which the City of Montgomery is not entitled to a judgment as a matter of law.

## II.    Race – Disparate Treatment

Plaintiff filed an Amended Complaint, which was allowed, adding a claim for race-based disparate treatment and retaliation. (Doc. No. 12-2, p.7). Plaintiff claims that she was terminated because of her race; her race being African-American. Plaintiff, however, has failed to exhaust her administrative remedies regarding her alleged race-based disparate treatment and retaliation. In the Motion for Leave to Amend Complaint, the plaintiff cites to the issuance of a right-to-sue letter on October 1, 2007 on EEOC charge No. 420-2007-01344 as the reason for Amending the Complaint to add the race-based allegations.

The charge of discrimination cited to, however, does not allege that any of the treatment complained of was on the basis of race. (Exhibit H, 12/28/06 EEOC Charge of Discrimination).

Not only is the box labeled "race" not checked, but the Charge is very specific in that it alleges that the plaintiff believes that "I am a victim of retaliation for filing an EEOC Charge of Discrimination against the MPD and sex discrimination in violation of Title VII." (Exhibit H). As to the previous Charge of Discrimination to which she refers, she states; "I filed an EEOC Charge of Discrimination against the Montgomery City Police (MPD) for sex harassment and retaliation on or about June 26, 2006." (Exhibit F, 7/24/06 Charge).  Nowhere in any of Plaintiff's EEOC Charges of Discrimination is race-based treatment even mentioned.  Nor is there mention of any facts which would constitute race-based treatment.  In fact, when asked point blank about her EEOC filings and her lawsuit, she testified as follows:

> Q.    (Mr. Mills) Mrs. Dean, the three documents we are looking at, Defendant's Exhibit Nos. 1 and 4 and 5, are these the only EEOC claims that you have filed against the City of Montgomery?
>
> A.    Yes, sir.
>
> Q.    Let me ask you this: Are you alleging that you have been discriminated against based upon your race?
>
> A.    No, sir.
>
> Q.    You are not alleging that in this lawsuit?
>
> A.    No, sir.

(Exhibit I, Deposition of Shirley Dean, 91:18 – 92:4).

At very least, the Plaintiff has failed to exhaust her administrative remedies as required by Section 706 of Title VII, as they relate to a claim of race-based discrimination because she has made no such charge of discrimination.  E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265,

1271 (11th Cir.2002); 42 U.S.C. §2000e-5.  At most, she has denied that she has a claim for the alleged treatment.

III.    **Sex – Disparate Treatment**

The Amended Complaint filed in this case clearly states a cause of action for hostile work environment sexual harassment and for retaliation for the stance taken in opposition to the perceived harassment.  It does not, however, allege that the plaintiff was terminated, or that any other adverse employment action was taken against her, on the basis of her sex or because she was pregnant.[1]

The Amended Complaint alleges that, after she reported the harassment visited upon her by her co-worker, the plaintiff was written up for absenteeism (Doc. No. 12-2, p. 4, item 12), given twenty days suspension (Doc. No. 12-2, p. 4, item 13), that she filed an EEOC charge "because the sexual harassment continued and the retaliation . . . continued" (Doc. No. 12-2, p. 4, item 14), that she was transferred to third shift (Doc. No. 12-2, p. 4, item 15), and that she "continued to experience retaliation for her reporting of unlawful employment practices." (Doc. No. 12-2, p.4, item 16).  She alleges, further, that she was "ultimately terminated while she was eight and a half months pregnant" (Doc. No. 12-2, p. 5, item 16), and that "any reasons given for her termination are merely pretext and the true reasons are *in retaliation* for her opposition to unlawful employment practices." (Doc. No. 12-2, p. 5, item 17) *emphasis added*.

When asked in her deposition whether "your claim in this lawsuit [is] about your being harassed only," she replied: "yes."  (Exhibit I, Dean deposition, 92:14-20).  After being explained the difference between a disparate treatment claim and a harassment claim and being

---

[1]  The Pregnancy Discrimination Act, referred to in the Amended Complaint as "the Pregnancy Act" provides that "the prohibition against sex-based employment discrimination in § 703(a) of Title VII, 42 U.S.C. § 200e-2(a) applies with equal force to discrimination on the basis of 'pregnancy, childbirth, or related medical conditions.'" <u>Armindo v. Padlocker, Inc.</u>, 209 F.3d 1319 (11th Cir.2000); *citing* 42 U.S.C. §2000e(k).

asked which she was claiming, she said, "Sexual Harassment." (Exhibit I, Dean deposition, 93:3-17).

More importantly, Plaintiff has identified no direct evidence of sex-based disparate treatment, and has failed to identify a comparator who may have been treated more favorably. When asked in her deposition whether she could identify a comparator, Dean stated, "I don't have anybody." (Exhibit I, Dean deposition, 96:21). Plaintiff went on to say that the she knew of a male in the police department who was demoted when he fondled another female employee. (Exhibit I, Dean deposition, 97:2-10). She could not, however, identify a similarly situated male employee who had been treated differently from her—one who had been disciplined less severely for acts of misconduct similar to those for which Plaintiff was punished.

When asked whether she felt that she was treated the way she was because she was pregnant, she replied, "No." (Exhibit I, Dean deposition, 98:6 – 12). When asked whether there had been any pattern of the City or the jail treating pregnant women differently than non-pregnant women or males, she replied, "No." (Exhibit I, Dean deposition, 98:13 – 16).

As such, the plaintiff has alleged no set of facts upon which a jury could find that sex-based disparate treatment occurred. Defendant is, therefore, entitled to a judgment as a matter of law on any sex-based disparate treatment claim which the court may find has been alleged.

### IV.    Sexual Harassment

Counts I and III of the Amended Complaint purport to make a claim for sexual harassment, Count III being more specific in denominating the claim as one for hostile work environment. There is no allegation that the harassment was *quid pro quo*. (Doc. No. 12-2). In fact, the allegations show that the harassment complained of came from a co-worker and not from someone holding supervisory authority over Plaintiff.

Specifically, Plaintiff alleges that "Plaintiff Dean was a victim of sexual harassment by a male jailer.  She was subjected to unwelcome comments, offensive language of a sexual nature, and offensive touching over a long period of time." (Doc. No. 12-2, p. 4, item 11).  Plaintiff alleges that she reported the unwanted touching by her coworker to her supervisor and to the Assistant Warden.  Indeed, she reported that an unwanted touching was visited upon her by Calvin Knight on December 27, 2005.  She reported the incident to her supervisor, Ms. Hopkins, on December 27, 2005—the day that the incident occurred. (Exhibit B, Hopkins Affidavit).  She again reported it to the Assistant Warden, Ms. Brantley, on the following work day: December 28, 2005. (Exhibit A, Affidavit of Brantley).

A.    **Ellerth-Faragher** defense

The plaintiff has sued the City of Montgomery alone, and seeks to have the City adjudicated liable for the acts of her co-worker, Calvin Knight.  The plaintiff in this case, however, failed to take advantage of the City of Montgomery's policy on harassment.

Under what has become known as the Ellerth-Faragher defense, an employer may not be held liable where it shows that it 1) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Industries, Inc. v. Ellerth, 524 U.S. 741, 765, 118 S.Ct. 2257, 2270 (1998); *see also* Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2293 (1998).

"An employer can generally satisfy its reasonable care requirement by, first, promulgating a comprehensive anti-harassment policy and, second, promptly responding to the employee's complaint." Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1297 (11th Cir.2000).  The City of Montgomery has had in place since 2002, the City of Montgomery Policy

on Harassment in the Workplace. (Exhibit J). The plaintiff attended a training class at the

Montgomery Civic Center on February 8, 2002 wherein the terms of the policy were taught and a

copy of the policy was distributed to her. Plaintiff signed an acknowledgment on that day saying

that she attended the training, received a copy of the policy, and that she had read and understood

the policy. (Exhibit K). The policy defines the acts about which Plaintiff has complained in this

lawsuit as "Prohibited Acts of Harassment." (Exhibit J, p. 3, Section 3). In particular, the policy

sets out "touching of another person in a sexually suggestive way," and "sexually vulgar

language" as examples of the type conduct the policy is meant to prevent and correct for.[2]

(Exhibit J, p.3, Section 3).

The policy also requires that,

> Any employee who believes that he or she is being harassed should
> report it immediately in writing or verbally to his/her employer. If
> the complaint is made verbally, the complainant should make and
> maintain a written account detailing the date of the incident(s),
> what was said or done, and the names of all witnesses.

(Exhibit J, p.2-3, Section 4).

The only report made to the City about the conduct now complained of was the verbal

reporting of the December 27, 2005 fondling. That verbal report was made first to Plaintiff's

immediate supervisor and, the following day, to the Assistant Warden Ms. Brantley. (Exhibits A

& B, Affidavits of Hopkins and Brantley). While the plaintiff asserts in her deposition that she

made a previous report to Ms. Hopkins regarding offensive language used by Knight, there is no

record of it, and the plaintiff failed to make and keep a written account of the incidents as

---

[2] See item 10 of Amended Complaint (Doc. No. 12-2) which refers to "unwelcome comments, offensive language
of a sexual nature, and offensive touching."

required under the policy. (Exhibit I, Dean deposition, 17:14 – 18:2)[3]. Moreover, the supervisor, Ms. Hopkins, maintains that no such report ever occurred. (Exhibit B, Hopkins Affidavit).

Similarly, when asked about other complaints which may have put the City on notice, Plaintiff testified in her deposition that the Assistant Warden, Ms. Brantley had written Officer Knight up for touching another female. (Exhibit I, Dean deposition, 35:23 – 36:4). Plaintiff's testimony was that Knight had grabbed Ms. Robinson's "butt" with an open palm in front of Assistant Warden Brantley. (Exhibit I, Dean deposition: 36:1 – 37:23). There is, however, no such write up in Knight's personnel file, and Ms. Brantley maintains that what she saw was a mutual pushing and shoving which she characterized as horseplay; that neither Robinson nor Knight touched the other inappropriately or on an inappropriate body part. (Exhibit A, Brantley Affidavit). In fact, Plaintiff testified that the relief supervisor for Ms. Hopkins (who was, presumably, not there that night) said in the briefing that "the horseplaying, the touching would not be tolerated and that it was to cease. (Exhibit I, Dean deposition, 37:12 – 18). Plaintiff went on to testify that her knowledge of the write up was based upon "rumors being spread." (Dean deposition, 38:17 – 23).

As to the City's duty under Ellerth-Faragher to "correct promptly any sexually harassing behavior," immediately upon receiving the complaint, the City of Montgomery began an internal affairs investigation into the incident, at the conclusion of which, and Officer Knight was suspended for two days (Exhibit L, Notification of Suspension); Ellerth, 524 U.S. at 765, 118 S.Ct. at 2270.

---

[3] Plaintiff initially asserted that Knight used "unwanted gestures" as well as "calling females bitches and ho's," but when pressed on what the "gestures" consisted of, admitted that no gestures had been directed to her. (Exhibit __, Dean deposition, 19:23 – 20:12)

Because she only reported one incident in the manner required by the City's harassment policy, Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by" the policy as they might apply to any *pervasive* conduct on the part of Knight, or to his use of offensive language or gestures.  The City took corrective action for the one incident about which it had knowledge.  If the harassment began before December 27, 2005, or continued after that time, the City had no opportunity to correct it because it had no notice.

The first time the city had notice that the alleged harassment had not stopped was upon the filing of the June 26, 2006 EEOC charge of discrimination. (Exhibit D, EEOC charge).  It was then that Plaintiff was moved off of second shift to third shift—the reasons for which will be discussed more thoroughly herein below.  A prima facie case for sexual harassment requires, among other things, that the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993).  As far as the City knew, the December 27, 2005 touching was an isolated incident which had been corrected.  It relied upon its policy for notification that there might be a "pervasive" situation, and it got no such notice until its receipt of the June 26, 2006 EEOC charge of discrimination.

**B.      Employer Liability for Co-worker Harassment**

Closely related to the Ellerth-Faragher defense is the principle that the plaintiff must establish some knowledge and inaction on the part of the employer in order to attach to it liability for the harassment of a co-worker.  The Eleventh Circuit Court of Appeals has ruled that,

> Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action. *See Breda v. Wolf Camera & Video,* 222 F.3d 886, 889 (11th Cir.2000). Thus, a victim of coworker harassment must show either actual knowledge on the part of the

> employer or conduct sufficiently severe and pervasive as to
> constitute constructive knowledge to the employer. *See id.*

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269 (11th Cir.2002).

As discussed above, the City of Montgomery had actual knowledge of only one incident of unwanted touching by the co-employee—for which it took disciplinary action against the co-employee. As to the allegation that the perpetrator used offensive and sexually explicit language and gestures, or that the conduct continued beyond the single reporting, the City of Montgomery had no knowledge of the alleged acts until the filing of Plaintiff's EEOC charge of discrimination in June of 2006.

Plaintiff cannot show, therefore, that the City of Montgomery had actual knowledge of the alleged pervasive acts. And, just as in the case of the Ellerth-Faragher defense, the City's policy on harassment precludes a finding of constructive knowledge. The Eleventh Circuit has held that an employer is "entitled to rely on the procedural framework provided in the policy to remain apprized of the conduct of its own staff." Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1553 (11th Cir.1997). In that decision, the court went on to say:

> Our circuit thus places upon the employer an obligation to make
> reasonable efforts to know "what is going on" with respect to its
> own employees. Where there is no policy, or where there is an
> ineffective or incomplete policy, the employer remains liable for
> conduct that is so severe and pervasive as to confer constructive
> knowledge. Where there exists an effective policy such as that
> present in the instant action, however, we conclude that the
> employer has made reasonably diligent efforts to learn and know of
> the conduct of its employees. Stated differently, we believe that
> once a company has developed and promulgated an effective and
> comprehensive anti-sexual harassment policy, aggressively and
> thoroughly disseminated the information and procedures contained
> in the policy to its staff, and demonstrated a commitment to
> adhering to this policy, it has fulfilled its obligation to make
> reasonably diligent efforts to "know what is going on" within the
> company; beyond this point, it is incumbent upon the employees to

utilize the procedural mechanisms established by the company
specifically to address problems and grievances.

Farley, 115 F.3d at 1553 (11th Cir.1997).  That the policy in this case is effective in notifying the

employer of harassing conduct is best exemplified by the one instance where Plaintiff did notify

her supervisors—on December 27 and 28, 2005.  On that occasion, the policy worked as

designed; memos were generated and sent up the chain of command, an internal affairs

investigation was initiated, witnesses questioned, and, ultimately, the perpetrator was disciplined

and separated from the Plaintiff's work area.  There can be no question, but that the policy was

"aggressively and thoroughly disseminated" and that the Plaintiff herself was trained on it and

given a copy of it.  Farely, 115 F.3d at 1553 (11th Cir.1997).

     Central to the City's argument here is the fact that Plaintiff never notified them of any

continuing conduct on the part of the co-employee.[4]  Nor did she notify her supervisors of

Knight's use of offensive language or gestures.  The City, based upon the Farley ruling, has a

right to "rely on the procedural framework provided in the policy to remain apprized of the

conduct of its own staff." Farley, 115 F.3d at 1553 (11th Cir.1997).  It did not, therefore, have

either actual or constructive knowledge of anything beyond one incident of unwanted touching,

and it took corrective action for that.

     The City of Montgomery, therefore, cannot be held liable for the unreported acts of

Plaintiff's co-worker.  That leaves only the one unwanted touching which occurred on December

27, 2005.  The City of Montgomery took corrective action for that act.  That act alone, however,

is not "sufficiently severe or pervasive to alter the terms and conditions of employment and

create a discriminatorily abusive working environment." Harris v. Forklift Systems, Inc., 510

U.S. 17, 21, 114 S.Ct. 367, 370 (1993). As such, the City of Montgomery is entitled to a

---

[4] Plaintiff's testimony is that Calvin Knight only touched or "fondled" her on the one occasion reported on
December 27, 2005.

judgment as a matter of law on the claim for sexual harassment and hostile work environment.

### V.     Retaliation

Plaintiff alleges that she was retaliated against after reporting the December 27, 2005 fondling to her supervisor.  She alleges that she received 1) a written counseling for absenteeism on January 9, 2006, and 2) was suspended for twenty days on March 12, 2006.  She alleges that she then filed her first EEOC charge of discrimination on June 26, 2006, after which she was 3) transferred to third shift and 4) terminated on December 21, 2006.  (Doc. No. 12-2, p. 4-5, items 11-17).

"[T]o establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision." Gupta v. Florida Board of Regents, 212 F.3d 571, 587 (11th Cir.2000).  "Once the prima facie case is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action. The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir.1998).

The City of Montgomery has legitimate, non-retaliatory reasons for each employment action taken.

### A.     Counseling for Absenteeism

On January 9, 2006 Plaintiff received a written counseling for failing to report for duty on December 18, 2005 and December 20, 2005 without prior authorization and for not having sufficient accrued leave time to allow for the time off. (Exhibit C, 1/9/06 Counseling Report). She not only failed to show up for work without calling in or getting permission to be off, but she had run out of leave time and was not entitled to the time off.

**B.    Twenty Day Suspension**

Plaintiff alleges she was suspended on March 12, 2006.  Actually, she was suspended on July 9, 2006 for an event which came to her supervisor's attention on March 13, 2006.  Plaintiff called in sick on March 12, 2006.  On March 13, 2006, Plaintiff called in to report that she would not be returning to work until March 14, 2006.  It was during that telephone call that she reported to her supervisor that she had sustained an on the job injury on March 7, 2006 when she slipped in the hallway.  (Exhibit B, Hopkins Affidavit).  Plaintiff was disciplined for failing to promptly report her on the job injury as required by Article I Section 1.330 of the employee handbook requiring Prompt and accurate reporting of all official matters. (Exhibit M, Article I, Section 1.330, MPD manual).  Plaintiff had been counseled on that very issue before.  She received a twenty day suspension in accordance with the City of Montgomery's Progressive Disciplinary Policy, which requires that discipline be meted out in increasingly harsh steps to "insure equitable treatment and encourage acceptable performance."  The purpose of the Progressive Disciplinary Policy is to give employees ample opportunity to be apprised of and correct unacceptable behavior before they are ultimately terminated.  Prior to her twenty day suspension, Plaintiff had already received eight (8) counseling forms, two (2) letters of reprimand, and one ten (10) day suspension, all for various conduct.

**C.    Transfer to Third Shift**

Plaintiff's filing of her June 26, 2006 EEOC Charge of Discrimination was the first notice that the City of Montgomery received that the harassment by Calvin Knight may have continued beyond the December 27, 2008 touching.  After the receipt of that notice, Major Celia Dixon, commander of the administrative division of the Montgomery Police Department (under which the municipal jail is operated), after consultation with the Legal Department and jail Warden, determined that Plaintiff and Officer Knight should be separated onto different shifts in order "to take [Ms. Dean] out of the environment that she was working in."  (Exhibit N, Dixon

deposition 39:5-6).  Understaffing of the jail, coupled with the lack of required male jailers on

the second shift prevented a transfer of Officer Knight off of the shift.

The long-standing policy in the Montgomery Municipal Jail is that all inmates are to be

strip searched "any time they return from a contact visit or other excursion out of the secure

perimeter of the facility."  (Exhibit O, Jail Policy & Procedures, p. 3).  The policy also requires

that "[s]trip searches will be conducted by MJCO's (Municipal Jail Correctional Officers) of the

same sex as the inmate," and that [s]trip searches will be conducted in private with two officers

of the same sex." (Exhibit O, Jail Policies and Procedures, p. 1, item B. (3)).

The same-sex search policy was formulated and maintained in an attempt to comply with

the Eleventh Circuit's rulings regarding inmate privacy.  (Exhibit P, Collins Deposition, 27:19 –

28:12).  In Fortner v. Thomas, the court was "persuaded to join other circuits in recognizing a

prisoner's constitutional right to bodily privacy because most people have 'a special sense of

privacy in their genitals, and involuntary exposure of them in the presence of people of the other

sex may be especially demeaning and humiliating.'" Fortner v. Thomas, 983 F.2d 1024, 1030

(11th Cir.1993) *citing* Lee v. Downs, 641 f.2d 1117, 1119 (4th Cir.1981); *and pointing also to*

Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir.1992).

Plaintiff and Knight both worked on second shift, a shift with special requirements for the

presence of mail correctional officers; it is during that shift when all daily work-release inmates

as well as "food service people" are processed back into the facility after their work shift, a

process which, according to policy, required the strip search of all returning inmates.  (Exhibit P,

Collins Deposition, 28:2 – 8).  A typical situation for the jail was testified to by Willie Collins.

At the time of his deposition, the jail housed three hundred ninety six (396) inmates, of which

only twenty four (24) to thirty (30) were female (94% to 92.5% male). (Exhibit P, Collins

Deposition, 31:22 – 32:4).  At the time, the jail staff was made up of fewer males than females.

(Exhibit P, Collins Deposition, 32:18 – 19).  In fact, Warden Collins had sought and obtained

clearance from the Montgomery City-County Personnel Board—a BFOQ—to give hiring preference to male jailers in an attempt to increase the numbers of male jailers. (Exhibit P, Collins Deposition, 31:4-18). Coupled with this dilemma was an overall staff shortage being experienced on third shift at that time. (Exhibit P, Collins Deposition: 38:7-14). Moving Officer Knight off of second shift would have made an already strained situation critical—critical to the safety of both the inmates and jail staff.

Prior to moving Plaintiff to third shift, however, Warden Collins asked Plaintiff if she would volunteer to go to third shift, and after thinking about it, she called him and told him that she would. (Exhibit P, Collins Deposition 19:5-9) *see also* (Exhibit A, Brantley Affidavit, pp. 2, 3).[5] Later, Plaintiff decided she wanted to move back to second shift, and she was allowed to (Exhibit A, Brantley Affidavit). Her move to third shift was not retaliatory, as has been alleged. It was done in an effort to prevent the continuation of any sexual harassment which might have been ongoing. Again, it is important to note that no complaints against Officer Knight had been received after December 28, 2005.

**D.    Termination**

Plaintiff was terminated on January 23, 2007 for refusing a direct order from the Administrative Division Commander to answer questions in an internal affairs investigation. The internal affairs investigation in question was opened to investigate charges that Plaintiff had cursed and used abusive language toward a second shift police officer who was working in the jail on light duty. (Exhibit G, Notification of Dismissal, p. 3, Charge 1, Specification 1). When summoned to internal affairs to give a statement about the event, Plaintiff refused to answer the investigator's questions. The investigator retrieved the Administrative Division Commander— for whom Plaintiff worked—who then repeated the command. She was ordered by Major Celia

---

[5] Collins had spoken to Plaintiff on more than one occasion prior to this event about moving her to third shift because she had had problems with supervisors on the second shift for her failing to follow orders. (Exhibit P, Collins Deposition, 18:23 – 19:5).

Dixon to answer the investigator's questions. Plaintiff replied that she would not answer the questions. Dixon told her that she did not have that option. Again, the plaintiff refused, saying that she would not answer questions without her lawyer present. Dixon told Plaintiff she was giving her a direct order to answer the questions. Plaintiff replied that Dixon could give her a direct order if she wanted to, but that she was not going to answer the questions. (Exhibit N, Dixon Deposition, 13:10-18). Plaintiff's own testimony bears this out. She testified as follows:

> Q.    Were you given a direct order to answer those questions?
>
> A.    The second time I was.
>
> Q.    Tell me what happened on that day.
>
> A.    When I told Sergeant Wingard I wasn't answering any questions until I consult my attorney, he went and got Major Dixon.
>
> Q.    What did Major Dixon do?
>
> A.    She gave me a direct order to give him a statement.
>
> Q.    And what was your response?
>
> A.    I told her when I consult my attorney I would give a statement.
>
> Q.    So you refused to give that statement?
>
> A.    Until I consult my attorney.
>
> Q.    Okay. Is that what you were terminated for?
>
> A.    Yes.

(Exhibit I, Dean Deposition, 71:11 – 72:2).

Plaintiff was charged with violating Article II, Section 2.007 of the MPD rules and regulations, for failing to obey a direct order, her previous record considered. (Exhibit G, Notice of Dismissal with attachments). Plaintiff's previous record weighed heavily in the determination

that termination was the appropriate punishment, as required by the Progressive Disciplinary Policy. (Exhibit Q, Progressive Disc. Policy.).  Plaintiff's record included eight (8) counseling forms, (2) letters of reprimand, two (2) suspensions, and she had a recommendation for another five (5) day suspension pending.  (Exhibit G, Notice of Dismissal).  Plaintiff's termination, therefore, was for refusing to obey an order of a superior officer, and not in retaliation for any protected activity.

**VI.    Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323.  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing, or pointing out to, the district court that the non-moving party has failed to present evidence in support of some elements of its case on which it bears the ultimate burden of proof. See Id at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires a non-moving party to go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, or admissions on file, designate specific facts showing there is a genuine issue for trial." Id. at 324.  To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  Conclusory allegations cannot interpose genuine

issues of material fact into the litigation so as to preclude entry of summary judgment. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

After the non-moving party has responded to a motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Yannella v. City of Dothan, 66 F. Supp. 2d 1233 (M.D. Ala. 1999).

## CONCLUSION

The City of Montgomery is entitled to a summary judgment on Plaintiff's §1981 and §1983 claims because 1) §1981 does not confer a right of action against a state actors, including the City of Montgomery (Butts v. County of Volusia, 222 F.3d 891, 894 (11th Cir. 2000)), and 2) Plaintiff has made no allegation to support a claim that a policy or procedure of the City of Montgomery caused her alleged injury. (Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 663, 98 S.Ct. 2018, 2022, 56 L.Ed.2d 611 (1978)).

Likewise, the City is entitled to a summary judgment on the race-based disparate treatment claim because 1) Plaintiff admitted in deposition that she was not discriminated against based upon her race, and 2) she failed to exhaust her administrative remedies, the six month statute for which has now expired.

As to the sex-based disparate treatment claim, Plaintiff also disavowed that claim in deposition. She has also failed to identify, either in the complaint or in her deposition any direct evidence to support such a claim, or a similarly situated comparator who was treated more favorably. She has failed to allege a set of facts from which a jury could find that sex-based disparate treatment occurred.

The City of Montgomery is entitled to a summary judgment on Plaintiff's hostile work environment/sexual harassment claim because, based upon the facts asserted, a jury could not find liability on the part of the City of Montgomery. Plaintiff has sued the employer only. Since,

the only complaint made regarding the alleged harassment was one complaint about a one time

touching, and since Plaintiff did not notify the City about any ongoing harassment or, for that

matter, anything to do with abusive language or gestures, the City had no knowledge that the

harassment was occurring.  The City took action to discipline the perpetrator of the unwanted

touching, and had the right to rely upon its policy to ensure that it was notified of anything

further; something Plaintiff failed to take advantage of.  Similarly, since the perpetrator was a co-

worker, and had no supervisory or other authority over Plaintiff, knowledge cannot be imputed to

the City.


/s/ Wallace D. Mills
Wallace D. Mills (MIL 090),
Attorney for the City of Montgomery


OF COUNSEL:
City of Montgomery Attorney's Office
P.O. Box 1111
Montgomery, AL 36101-1111
Phone: (334) 241-2050
Fax: (334) 241-2310

## CERTIFICATE OF SERVICE

I hereby certify that on the 2d day of September, 2008, I electronically filed the foregoing
with the Clerk of the court using the CM/ECF system which will send notification of such filing
to the following parties or counsel:

Kathryn Dickey, Esq.
Law Offices of Kathryn Dickey, LLC
322 Alabama Street, Ste. B
Montgomery, AL  36104


and I hereby certify that I have also mailed by United States Postal Service the document to the
above-named non-CM/ECF participants:


/s/ Wallace D. Mills
OF COUNSEL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| SHIRLEY D. DEAN,<br>     Plaintiff,<br>  vs.<br>CITY OF MONTGOMERY,<br>     Defendant | )  Case No.: 2:07-CV-496<br>)<br>)  **AFFIDAVIT OF M.E. BRANTLEY**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

STATE OF ALABAMA

COUNTY OF MONTGOMERY

In person appeared before the undersigned officer, duly authorized to administer oaths, Assistant Warden M.E. Brantley, who states under oath as follows:

1.     I have personal knowledge of the facts set forth in this affidavit. I am an adult resident citizen of the State of Alabama and I am competent to give this affidavit.

2.     I am the Assistant Warden of the Montgomery Municipal Jail for the City of Montgomery Police Department.

3.     Shirley Dean was hired by the City of Montgomery on October 26, 2001, and continued in her employment as a correctional officer at the Montgomery Municipal Jail until her termination on January 23, 2007. During that time, the only incident of alleged harassment involving Officer Knight that I am aware of is an incident dated 12/27/2005 involving Shirley Dean. On 12/28/05, I received a telephone call from Ms. Dean. Ms. Dean stated that Officer Knight accidentally hit her on the buttocks and that and she hit him back.

4.     This was the only report Ms. Dean made to the City about unwanted touching and fondling. Ms. Dean has not reported any other incidents of harassment to

1

DEFENDANT'S
EXHIBIT
A

me or, to my knowledge, to any of her supervisors. I am unaware of any reports being made regarding the use of abusive or offensive language by Officer Knight, either by Ms. Dean or other jail staff.

5.    Ms. Dean was moved from second shift to third shift by the Warden and Administrative Division Commander. Later, Officer Dean decided she wanted to move back to second shift, and she was allowed to move back. Attached to this Affidavit are copies of my memos that were written to Warden Collins about this situation. Those memos were made by me in the ordinary course of my business as Assistant Warden at or near the time which the events occurred which are the subject of the memos. They have been kept in the ordinary course of business.

6.    Further, there was an "event" that I witnessed between Officer Knight and Officer Robinson. What I saw was a mutual pushing and shoving which I characterized as horseplay. Neither Robinson nor Knight touched the other inappropriately or on an inappropriate body part. Specifically, I did not see Officer Knight touch Ms. Robinson on her buttocks in any manner.

7.    To my knowledge, Officer Dean has not been retaliated against in any way.

8.    I have read the above and foregoing affidavit consisting in total of two (2) pages and state that it is true and correct to my present knowledge and information.

Further affiant saith not.

M.E. Brantley, Assistant Warden

**SWORN TO AND SUBSCRIBED** before me this 2nd day of September, 2008.

(SEAL)

Notary Public

My Commission Expires   10/16/09

SEP/22/2006/FRI 03:23 PM    CITY OF MONTGOMERY    FAX No. 2412310    P. 001
Sep 22 06 03:50p    Montgomery Jail    3342412864    p.3

<u>Memorandum</u>

To:        W.R. Collins, Jail Administrator

From:      M.E. Brantley, Assistant Warden  *M. E. Brantley*

Subject:   MJCO S. D. Dean #1185

Date:      August 16, 2006

On today's date, I spoke with MJCO Dean. Also present were third shift supervisors
A.D. Allen and J.C. Welch.

I asked MJCO Dean how she was doing and she stated that she liked working third shift
and got along well with her coworkers. She also stated that she did not want to return to
second shift. I informed her that she could return to second shift if she preferred and that
I was glad she was satisfied with third shift.

At approximately 0730 hours, I received a call from MJCO Dean informing me that her
husband wanted her to return to second shift, but she preferred third shift. She stated that
she would further discuss the issue with her husband, think it over and inform me of her
discuss the following day.

Memorandum

To:          W.R. Collins, Jail Administrator

From:        M. E. Brantley, Assistant Warden   *M.E. Brantley*

Subject:     MJCO S. D. Dean #1185

Date:        August 17, 2006

On today's date, MJCO Dean advised me that she would like to think about returning to
second shift over the approaching weekend and would inform me of her decision on
Monday, August 21, 2006.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| SHIRLEY D. DEAN,<br>　　　　Plaintiff,<br>　　vs.<br>CITY OF MONTGOMERY,<br>　　　　Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 2:07-CV-496<br><br>**AFFIDAVIT OF J.H. HOPKINS** |

STATE OF ALABAMA

COUNTY OF MONTGOMERY

     In person appeared before the undersigned officer, duly authorized to administer oaths, Hopkins, who states under oath as follows:

     1.     I have personal knowledge of the facts set forth in this affidavit. I am an adult resident citizen of the State of Alabama and I am competent to give this affidavit.

     2.     I am a Montgomery Municipal Jail Corrections Officer and am Supervisor for the 2nd shift.

     3.     Shirley Dean was employed as a Jailer in the Montgomery Municipal Jail and I was her supervisor.

     4.     During this time, the only incident of alleged harassment involving Officer Knight that I am aware of is an incident which occurred on 12/27/2005, and which Ms. Dean reported to me on that same day.

     5.     Ms. Dean reported to me that Officer C.W. Knight accidentally hit her on the butt. She also stated that Officer Knight was trying to hit her on the back and that she didn't think he meant to do it.

1



DEFENDANT'S
EXHIBIT
B

6.    Ms. Dean did not report any other incidents of harassment to me, either before or after 12/27/05.  She has never reported that Knight used offensive language, or that he touched her in any manner, except for the incident on 12/27/05.

7.    Ms. Dean made no previous report to me regarding offensive language used by Knight, and there is no record of it.

8.    On 01/09/06 I attempted to counsel Officer Dean regarding her failing to report to work on 12/18/05 and 12/20/05.  She failed to call in to get permission to miss work on those days and was, consequently, carried on the Jail worksheet for 8 hours without pay on 12/18/05 and 1.5 hours without pay on 12/20/05.  Officer Dean refused to sign the counseling form.

9.    On 3/12/06, Officer Dean called in sick.  On 3/13/06 she called in to report to me that she would not return to work until 3/14/06.  She further stated that she injured her leg while on duty on 3/7/06 when she slipped in the jail.  Officer Dean did not report this on the job injury to me prior to 3/13/06.

10.    To my knowledge, Officer Dean has not been retaliated against in any way.

I have read the above and foregoing affidavit consisting in total of two (2) pages and state that it is true and correct to my present knowledge and information

Further affiant saith not.

_J. H. Hopkins_ _#598_
J.H. Hopkins

**SWORN TO AND SUBSCRIBED** before me this _2nd_ day of September, 2008.

(SEAL)

Notary Public

My Commission Expires  10/16/09



# CONFIDENTIAL
## MONTGOMERY POLICE DEPARTMENT
### COUNSELING REPORT FORM

Complete this form during counseling session. The counselor and employee must sign this form at the conclusion of the session. The original completed form will be submitted to the Division Commander's Office and a copy given to the employee.

## I. IDENTIFYING INFORMATION

NAME: __S.D. Dean, #1185__                                      DATE: __01/09/06__

DIVISION: __A.D. (Jail)__                                            TIME: __2230__

COUNSELOR: __J.H. Hopkins #598__

OTHERS PRESENT DURING SESSION: __J.C. Welch #361__

## II. REASON FOR COUNSELING

☐ SPECIAL ASSIGNMENT _____

☐ POOR GRADES _____

☒ RULES VIOLATION __Absenteeism 2.212_____

☐ PERSONAL APPEARANCE
     AND HYGENE _____

☐ CONDUCT & BEHAVIOR _____

☐ OTHER _____

## III. COUNSELOR'S RECOMMENDATION AND COMMENTS

Officer Dean, as a member of the Montgomery Municipal Jail it is your responsibility to report for your scheduled duty hours unless properly authorized. On December 18, 2005 (8 hours) and December 20, 2005 (1.5 hours) you were carried on the jail's worksheets without pay. This is not acceptable and you are expected to prevent further occurrances of this nature. You must have accured leave time before requesting leave, which must be pre-approved by your supervisor.

DEFENDANT'S EXHIBIT C

_Refused to sign_ ~mb~
OFFICER/CIVILIAN SIGNATURE                    COUNSELOR'S SIGNATURE

I sign this form as an acknowledgment that I have been counseled. This is neither an admission nor a denial of the facts stated.

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | 420-2006-03489 |
| X | EEOC | |

and EEOC

_State or local Agency, if any_

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mrs. Shirley D. Dean | (334) 395-8462 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | Date of Birth |
|---|---|
| 500 Eastdale Rd. South Apt. N3   Montgomery, AL 36117 | 09/09/69 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| City of Montgomery | 15+ | (334) 241-2532 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | | COUNTY |
|---|---|---|
| 320 North Ripley Street    Montgomery, AL 36104 | RECEIVED | Montgomery |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | JUN 2 6 2006 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | RACE | | COLOR | X | SEX | | RELIGION | | AGE |
|---|---|---|---|---|---|---|---|---|---|
| X | RETALIATION | | NATIONAL ORIGIN | | DISABILITY | | OTHER (Specify) | | |

DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)      LATEST (ALL)

April 2006

| X | CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am an African-American female employed by the City of Montgomery at the City Jail as a Correction Officer. I have been employed for approximately five years. Janice Hopkins is my immediate supervisor. I have been subjected to unwelcome and offensive sexual harassment for nearly three years. Officer Calvin Knight often uses offensive language of a sexual nature in my presence and sometimes to me directly. I try to keep my distance from Officer Knight because of the language he uses. Additionally, Officer Knight has offensively touched female officers, including myself, while at work in a sexual manner. Both the vulgar language and the offensive touching was reported to his supervisor, Janice Hopkins, prior to the Dec. 27, 2005, incident, but Knight continued his sexual harassment. Two female officers reported his vulgar language and also his touching Officer Robinson's butt was previously reported. On or about Dec. 27, 2005, Officer Knight touched me in an offensive manner. He was sitting in a chair at a desk and I reached to get some papers from the desk. He took his open palm and started at the back of my knees and brought his hand all the way to butt and squeezed it. I reported this to my supervisor on the same day of the incident. On the 28th I reported the incident to Assistant Warden Brantley and she said she would look into it. I have been retaliated against since reporting the sexual harassment. I was given a write-up in January 2006 for taking a sick day on or about Dec. 18, prior to the touching incident. In April Captain McCloud recommended a twenty day suspension without pay. At first I just said I would take the 20 days, but before being placed on suspension, I requested a hearing, still within the time-frame. The hearing was to be on May 3, but Capt. McCloud claimed he could not get the paperwork back in order for me to have the hearing. I believe I am a victim of sexual harassment and retaliation in violation of Title VII. I have hired an attorney, Kathryn Dickey, located at 322 Alabama Street, Montgomery, AL. Her telephone number is (334) 262-0728.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) _Darlene Clark_ |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. _Shirley Dean_ | SIGNATURE OF COMPLAINANT _Shirley Dean_ |
| Date          Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

EEOC FORM 5 (10/94)

DEFENDANT'S EXHIBIT D

PER FORM 32
Revised 12/01

# RECOMMENDATION FOR DISCIPLINARY ACTION

Employee: _____ MJCO Shirley D. Dean _____

Address: _____ By Hand _____

Date: _____ April 25, 2006 _____

You are herewith notified that I am recommending that you be:

____X____ Suspended for  20 working days

_____ Dismissed

_____ Demoted from  _____  to  _____

The reasons for this recommendation are: *(List all charges - attach additional sheets as required)*

1. Violation of Article I, Section 1.330 - DUTIES OF RESPONSIBLE EMPLOYMENT (Prompt and Accurate Reporting of all Official Matters).

Previous Record Considered *(Chronological list of prior offenses and action taken)*

As per copy furnished with original charges and specifications.

_____ Transcripts of hearing attached

A hearing will be set by the Appointing Authority to consider this recommendation and the charges. You will be given the opportunity to respond to the recommendation and these charges at this hearing. You will be notified in writing of the hearing date and your rights at said hearing.

_____ Supervisor/Department Head

I hereby certify that this document was given to the employee or placed in the United States mail on

05        18        2006
(month     day      year)

_____ #346 _____ Supervisor/Department Head

_____ Maj. C. G. Dixon _____ Witness

DEFENDANT'S EXHIBIT
E
tabbies

April 25, 2006


MEMO TO:  Mayor Bobby N. Bright

FROM:     Chief Arthur D. Baylor

SUBJECT:  DISCIPLINARY   ACTION   AGAINST   MUNICIPAL   JAIL
          CORRECTIONS OFFICER SHIRLEY D. DEAN.

MJCO Shirley D. Dean was notified to appear before a Department Review
Board to answer charges of violation of (1) **Article I, Section 1.330 – DUTIES
OF RESPONSIBLE EMPLOYMENT (Prompt and Accurate Reporting of all
Official Matters)** - of the Manual of Rules and Regulations.  Copies of charges
and specifications are attached.

MJCO Dean waived her right to a Review Board Hearing and agreed to accept
the recommendation of the Charging Authority.  Captain E.A. McCloud, Assistant
Commander of the Administrative Division, recommended that she be suspended
for twenty (20) working days for this violation.

Based on the evidence attached, I hereby uphold this recommendation.

Attached is all the evidence I used to reach my decision.

Appropriate forms are attached.


/bmr

April 24, 2006

<u>MEMORANDUM</u>

TO  : Chief A. D. Baylor

FROM : Captain E. A. McCloud

SUBJECT : REQUEST FOR HEARING BEFORE THE DEPARTMENTAL
     REVIEW BOARD
     May 03, 2006 @ 0930 Hours
     Municipal Jail Corrections Officer S. D. Dean, #1185

The below charges and specifications as outlined in regards to violation of Departmental Policy on the part of the above named employee are as follows:

CHARGE 1:  Violation of Article I, Section 1.330 of the Manual of Rules and Regulations governing members and employees of the Montgomery Police Department which reads as follows:

Duties of Responsible Employment – prompt and accurate reporting of all official matters

SPECIFICATION 1:  On or about March 12, 2006, Municipal Jail Corrections Officer S. D. Dean, #1185, called in sick.  On the following day, March 13, 2006, she called in to report that she would not return to work until March 14, 2006.  She further stated that she injured her leg on duty on March 07, 2006 when she slipped in the main hallway of the old jail.  She did not report this incident on the date of occurrence, failing to promptly notify her supervisor.  Furthermore, she failed to provide a detailed doctor's excuse regarding the exact nature of injury to her leg when asked to do so.

PAST DISCIPLINARY ACTION

MUNICIPAL JAIL CORRECTIONS OFFICER S. D. DEAN

01/09/06 – Counseling Form – Article II, Section 2.212 – Absenteeism

04/07/05 – Suspension (10 working days) - Article II, Section 2.037 – Duty to respond

12/30/04 – Counseling Form – Article II, Section 2.215 – Authorized sick leave

09/23/04 – Counseling Form – Article II, Section 2.215 – Authorized sick leave
Article II, Section 2.007 – Obedience to orders

02/23/04 – Letter of Reprimand – Article I, Section 1.330 – Duties of responsible employment, respect to other members and employees.  Article II, Section 2.003 – Conduct toward superiors, subordinates and associates.  Mandatory EAP counseling ordered.

02/19/04 – Counseling Form – Article II, Section 2.215 – Authorized sick leave

10/20/03 – Letter of Reprimand – Article I, Section 1.330 – Duties of responsible employment, respect to other members and employees

08/29/03 – Counseling Form – Article I, Section 1.330 – Duties of responsible employment, prompt and accurate reporting of all official matters

07/24/03 – Counseling Form – Article I, Section 1.315 – Conduct unbecoming an officer

03/18/02 – Counseling Form – Article I, Section 1.215 – Duty to obey.  Article I, Section 1.330 – Duties of responsible employment.  Article II, Section 2.003 – Conduct toward superiors, subordinates and associates

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | 420·2006·03489 |
| X | EEOC | |

and EEOC

_State or local Agency, if any_

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mrs. Shirley D. Dean | (334) 395-8462 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | Date of Birth |
|---|---|---|
| 500 Eastdale Rd. South Apt. N3 | Montgomery, AL 36117 | 09/09/69 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| City of Montgomery | 15+ | (334) 241-2532 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 320 North Ripley Street | Montgomery, AL 36104 | Montgomery |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | RACE | | COLOR | | SEX | | RELIGION | | AGE |
|---|---|---|---|---|---|---|---|---|---|
| X | RETALIATION | | NATIONAL ORIGIN | | DISABILITY | | OTHER (Specify) | | |

DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)    LATEST (ALL)
July 13, 2006

| X | CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am an African-American female employed by the City of Montgomery at the City Jail as a Correction Officer. I have been employed for approximately five years. I filed an EEOC Charge of Discrimination against the Montgomery City Police (MPD) for sex harassment and retaliation on or about June 26, 2006. On or about July 13, 2006, I received a letter from MPD stating I was being transferred to third shift, 10:30 PM to 7:00 AM. The letter stated the reason for my transfer was because I had filed litigation against the MPD and they wanted to protect me from the perception of retaliation. Transferring me to third shift and leaving the harasser on second shift is retaliation. MPD is aware that my husband works night shift and I have a young child. There is no way that my husband and I can both work night shifts. We have no place to leave our child. Why should I be the one to have to leave placing a hardship on my family when I am the victim and the harasser is a single male with no children at home? This shift change takes affect when I return to my job following my twenty day suspension on August 3, which is also a form of retaliation for reporting sex harassment. I believe I am a victim of retaliation for filing an EEOC Charge of Discrimination against the MPD in violation of Title VII. I have hired an attorney, Kathryn Dickey, located at 322 Alabama Street, Montgomery, AL. Her telephone number is (334) 262-0728.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT  RECEIVED |
| _Shirley Dean_ | _Shirley Dean_ |
| Date        Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)    JUL 2 4 2006 |

EEOC FORM 5 (10/94)

DEFENDANT'S EXHIBIT F

PER FORM 36
Revised 12/04

## NOTIFICATION OF DISMISSAL / DEMOTION

Certified Mail
Return Receipt Requested

Date | January 23, 2007

SHIRLEY D. DEAN
(Employee's Name)
103 REGENT COURT
(Street Address)
PRATTVILLE AL 36066
(City, State, Zip)

This is to notify you that as of this date, you are herewith dismissed/demoted from employment as a(n)

_____ Municipal Jail Corrections Officer _____ by the _____ Police _____
(Job Title)                                                (Department)

of _____ City of Montgomery _____
(City of Montgomery, Montgomery County, Montgomery Housing Authority, Montgomery Regional Airport Authority)

The reason(s) for this dismissal/demotion is (are) (list all charges - attach additional sheets as required):

Violation of Article I, Section 1.330, Obedience to Orders of the Manual of Rules and Regulations governing the Montgomery Police Department.

Previous record considered (list all previous actions considered - attach additional sheets as required):

You are entitled to a hearing before the Personnel Board on the above charges.

You may answer these charges within three (3) days from the date of receipt of the notification of dismissal/demotion, by responding in writing to your department head and providing a copy to the personnel Director, who is located at 27 Madison Avenue. Within ten (10) days from the time for filing your answer, you must file a written request with the Personnel Director if you desire a hearing before the Personnel Board. You may be represented by legal counsel at this hearing if you desire and you shall have the right to answer these charges and to present any statements, witnesses, evidence in your behalf and to cross-examine any other witnesses presented. Consult the Montgomery City-County Personnel Department, 27 Madison Avenue, relative to any other rights you have under the Merit System Law.

I hereby certify that this document was given to the employee or placed in the United States mail on

_____           _____           _____                    _____
Month           Day             Year                     Appointing Authority

_____                                                    Mayor
Employee                                                 Title

DEFENDANT'S EXHIBIT G

PER FORM 32
Revised 12/01

# RECOMMENDATION FOR DISCIPLINARY ACTION

Employee: _____ MJCO Shirley D. Dean _____

Address: _____ By Hand _____

Date: _____ January 4, 2007 _____

You are herewith notified that I am recommending that you be:

_____ Suspended for _____ -

___x___ Dismissed

_____ Demoted from _____ to _____

The reasons for this recommendation are: *(List all charges - attach additional sheets as required)*

> 1. Violation of Article I, Section 1.330 - DUTIES OF RESPONSIBLE EMPLOYMENT (Respect to Other Members and Employees). **Not Sustained**
>
> 2. Violation of Article II, Section 2.007 - OBEDIENCE TO ORDERS. **Sustained**

Previous Record Considered *(Chronological list of prior offenses and action taken)*

> As per copy furnished with original charges and specifications.

___x___ Transcripts of hearing attached

A hearing will be set by the Appointing Authority to consider this recommendation and the charges. You will be given the opportunity to respond to the recommendation and these charges at this hearing. You will be notified in writing of the hearing date and your rights at said hearing.

_____
Supervisor/Department Head

I hereby certify that this document was given to the employee or placed in the United States mail on

__1__ __9__ __07__
(month       day       year)

_____
Supervisor/Department Head

_____
Witness

December 29, 2006

## MEMORANDUM

TO            :  **Chief A. D. Baylor**

FROM       :  **Major C. J. Dixon**

SUBJECT   :  **REQUEST FOR HEARING BEFORE THE DEPARTMENTAL
                  REVIEW BOARD
                  January 03, 2007 @ 0930 Hours
                  Municipal Jail Corrections Officer S. D. Dean, #1185**

The below charges and specifications as outlined in regards to violation of
Departmental Policy on the part of the above named employee are as follows:

CHARGE 1:  Violation of Article I, Section 1.330 of the Manual of Rules and
Regulations governing members and employees of the Montgomery Police
Department which reads as follows:

### DUTIES OF RESPONSIBLE EMPLOYMENT

Every member and employee is obligated to faithfully discharge his employment for
so long as he is employed with the department. This responsibility includes but is
not limited to:

RESPECT TO OTHER MEMBERS AND EMPLOYEES

SPECIFICATION 1:  According to statements given on September 26, 2006, Ms.
Dean did use profanity to a police officer. Ms. Dean had been sitting in a chair and
left to go handle something in the jail. When she returned, Officer Dorsey was
sitting in her chair. The witnesses stated Ms. Dean became angry and began using
profanity to make Officer Dorsey get out of her chair.

CHARGE 2:  Violation of Article II, Section 2.007 of the Manual of Rules and
Regulations governing members and employees of the Montgomery Police
Department which reads as follows:

### OBEDIENCE TO ORDERS

SPECIFICATION 1:  Ms. Dean was called to Internal Affairs to give a statement
regarding an investigation. Ms. Dean refused to cooperate with Sergeant Wingard
and refused to give a statement. Sergeant Wingard notified me of his problem with

Ms. Dean.  I went to Sergeant Wingard's office and gave Ms. Dean a direct order to answer Sergeant Wingard's questions.  Ms. Dean stated to me that she was not going to answer any questions without her attorney and that we could do what we needed to do.

## PAST DISCIPLINARY ACTION

### MUNICIPAL JAIL CORRECTIONS OFFICER S. D. DEAN, #1885

Present – Pending Suspension (5 working days) – Article I, Section 1.330 – Duties of Responsible Employment, respect toward the public.

07/09/06    Suspension (20 working days)   Article I, Section 1.330 – Duties of Responsible Employment, prompt and accurate reporting of all official matters.

01/09/06    Counseling Form    Article II, Section 2.212 - Absenteeism.

04/07/05    Suspension (10 working days)   Article II, Section 2.037 – Duty to respond

12/30/04    Counseling Form    Article II, Section 2.215 – Authorized sick leave.

09/23/04    Counseling Form    Article II, Section 2.215 – Authorized sick leave. Article II, Section 2.007 – Obedience to orders.

02/23/04    Letter of Reprimand  Article I, Section 1.330 – Duties of Responsible Employment, respect to other members and employees. Article II, Section 2.003 – Conduct toward superiors, subordinates and associates. Mandatory EAP counseling ordered.

02/19/04    Counseling Form    Article, II, Section 2.215 – Authorized sick leave.

10/20/03    Letter of Reprimand  Article I, Section 1.330 – Duties of Responsible Employment, respect to other members and employees.

08/29/03    Counseling Form    Article I, Section 1.330 – Duties of Responsible Employment, prompt and accurate reporting of all official matters.

07/24/03    Counseling Form    Article I, Section 1.315 – Conduct Unbecoming an Officer.

03/18/02    Counseling Form    Article I, Section 1.215 – Duty to Obey.  Article I, Section 1.330 – Duties of Responsible Employment.  Article II, Section 2.003 – Conduct toward superiors, subordinates and associates.

**DEFENDANT'S EXHIBIT**

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act this form.

5—Dean

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA  ☒ EEOC | 420 2007 0 1344 |

and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) | |
|---|---|---|
| Mrs. Shirley D. Dean | (334) 395-8462 | |
| STREET ADDRESS    CITY, STATE AND ZIP CODE | | Date of Birth |
| 500 Eastdale Rd. South Apt. N3   Montgomery, AL 36117 | | 09/09/69 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| City of Montgomery | 15+ | (334) 241-2532 |
| STREET ADDRESS    CITY, STATE AND ZIP CODE | | COUNTY |
| 320 North Ripley Street    Montgomery, AL 36104 | | Montgomery |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| | | |
| STREET ADDRESS    CITY, STATE AND ZIP CODE | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)    LATEST (ALL) |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ AGE  ☒ RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  ☐ OTHER (Specify) | Dec. 21, 2006    ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am an African-American female employed by the City of Montgomery at the City Jail as a Correction Officer. I have been employed for approximately five years. I filed an EEOC Charge of Discrimination against the Montgomery City Police (MPD) for sex harassment and retaliation on or about June 26, 2006. On or about July 13, 2006, I received a letter from MPD stating I was being transferred to third shift, 10:30 PM to 7:00 AM. The letter stated the reason for my transfer was because I had filed litigation against the MPD and they wanted to protect me from the perception of retaliation. After filing a charge of retaliation with EEOC the City moved me back to second shift. The City has continued to retaliate against me since the filing of my original EEOC charge. Maj. Dixon, the major over my department, told me that she was going to do "every damn thing she possibly could to make sure I was fired". I have been under investigation five times since the filing of my EEOC. Three complaints were thrown out. Recently I was suspended for 29 days, which the Chief reduced to 5. I was placed on administrative leave on Dec. 12, 2006, for allegedly not providing a statement for something I knew nothing about. This was a new charge. Major Dixon called me on Dec. 19 at 2:10 PM to be at Sgt. Wingard's office at 4:00 PM. I was on my way to the primed with my daughter who had fallen and injured her arm, so I told Maj. Dixon said for me to call the next day and let the City know when she could come to the City. Dean called the next day to report that she could be there Dec. 21 or 22. Sgt. Wingard told me I had other charges. My daughter had to see a specialist on Thursday so I called to say that I would be there on Friday. I was told Friday, Dec. 22, 2006 that Mayor Bobby Bright had terminated me on Dec. 21. I am 8 ½ months pregnant. I believe I am a victim of retaliation for filing an EEOC Charge of Discrimination against the MPD and sex discrimination in violation of Title VII. I have hired an attorney, Kathryn Dickey, located at 322 Alabama Street, Montgomery, AL. Her telephone number is (334) 262-0728.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary for State and Local Requirements) |
|---|---|
| | Kathryn Dickey |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Shirley Dean | Shirley Dean    DEC 2 8 2006 |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS |
| Date    Charging Party (Signature) | (Day, month, and year)    12-27-2006 |

EEOC FORM 5 (10/94)

**DEFENDANT'S EXHIBIT**

H

1      A.      She heard Mr. Knight talking on

2  his telephone to somebody else.

3      Q.      What she related to you that she

4  heard was something about him saying how far he

5  could get with you?

6      A.      Yes, sir.

7      Q.      Had Officer Knight ever made any

8  advances towards you or propositions towards

9  you?

10     A.      No, sir.

11     Q.      Ever ask you out on a date or

12  anything like that?

13     A.      No, sir.

14     Q.      Did he ever express to you that he

15  had some desire?

16     A.      He told me I was cute, I was nice

17  looking, nice-built, but...

18     Q.      I believe you told me that you

19  were aware of Diane Ballard having made a

20  complaint about Officer Knight prior to this

21  December incident, is that right?

22     A.      Yes, sir.

23     Q.      Do you know of any other females



DEFENDANT'S
EXHIBIT
I

```
 1    who have made any complaints about Knight?

 2           A.     No, sir, just -- not a

 3    complaint -- the assistant warden wrote him up

 4    for touching another female.

 5           Q.     Now this is Ms. Brantley?

 6           A.     Yes.

 7           Q.     Who did she write him up for

 8    touching?

 9           A.     Ms. Robinson.

10           Q.     Do you know when that occurred?

11           A.     No, sir, it was prior to my

12    incident.

13           Q.     Do you know what happened in that

14    particular incident, either directly or from

15    people telling you?

16           A.     They were coming down the hallway

17    going to the briefing room and he grabbed her

18    and Ms. Brantley just happened to be behind

19    him -- we always head to the briefing room.

20           Q.     When you say he grabbed her, be

21    more specific.

22           A.     He grabbed her butt, fondled her

23    butt.
```

1       Q.    With his palm?

2       A.    With his palm.

3       Q.    Open palm?

4       A.    Yes.

5       Q.    Did you ever discuss that with

6 Ms. Robinson?

7       A.    No, sir, it was brought up in a

8 briefing.

9       Q.    Who was giving the briefing?

10      A.    Officer Welch.

11      Q.    Is Officer Welch a male?

12      A.    He's the relief supervisor to

13 Ms. Hopkins.

14      Q.    What did he say in the briefing

15 about it?

16      A.    He said that the horseplaying, the

17 touching would not be tolerated and that it

18 needed to cease.

19      Q.    And you don't remember when that

20 was?

21      A.    No, sir.

22      Q.    You don't have a general

23 recollection?

1    A.    I think it was -- it might have

2    been -- I know -- all I know it was prior to my

3    incident -- I can't remember what month.

4    Q.    You don't remember how long prior

5    to your incident?

6    A.    It might have been -- I'm not for

7    sure, but it might have been six months -- less

8    than a year.

9    Q.    Would it have been more than six

10   months?

11   A.    It might have been more than six.

12   Q.    Might it have been less than six?

13   A.    Might have been less than six.

14         MRS. DICKEY:  Well,

15   Ms. Robinson left.  Is there a way to -- I don't

16   know if there is a way to --

17   A.    Ms. Brantley gave him a counseling

18   form, so it should have been on file.

19   Q.    (Mr. Mills)  Did you see the

20   counseling form?

21   A.    No, it was just rumors being

22   spread that they got them.

23   Q.    So you don't know?

```
 1   and Retaliation.
 2        Q.     Is this another charge that you
 3   filed with the EEOC, is that correct?
 4        A.     Yes, sir.
 5        Q.     What's the date stamped at the
 6   bottom by your name that says received by EEOC?
 7        A.     December 28th, 2006.
 8        Q.     These three documents together,
 9   Defendant's Exhibit No. 1, 4 and 5, are there
10   any other EEOC complaints that you have filed
11   against the City of Montgomery that we are not
12   looking at right here?  And if you want to take
13   a break and talk to your lawyer, that's fine.  I
14   need to take a break anyway -- let's do that.
15                    11:10 AM
16                  (Short break.)
17                    11:13 AM
18        Q.     (Mr. Mills)  Mrs. Dean, the three
19   documents we are looking at, Defendant's Exhibit
20   Nos. 1 and 4 and 5, are these the only EEOC
21   claims that you have filed against the City of
22   Montgomery?
23        A.     Yes, sir.
```

```
1        Q.    Let me ask you this:  Are you
2   alleging that you have been discriminated
3   against based upon your race?
4        A.    No, sir.
5        Q.    You are not alleging that in this
6   lawsuit?
7        A.    No, sir.
8              MRS. DICKEY:  Could we go
9   offer the record a minute?
10             MR. MILLS:  Yeah.
11                  11:14 AM
12         (Off-the-record discussion.)
13                  11:15 AM
14       Q.    (Mr. Mills)  Mrs. Dean, first of
15  all there is a difference between purely sexual
16  discrimination in terms of you getting fired
17  because you are a female, and then you being
18  harassed because of your sex.  Is your claim in
19  this lawsuit about your being harassed only?
20       A.    Yes.
21       Q.    Are you alleging that you were
22  treated differently than males, strictly on the
23  face of it in terms of either being hired,
```

1    disciplined, or terminated?

2         A.    Explain this.

3         Q.    Is your claim just a sexual

4    harassment claim, or what we call it in law

5    either disparate treatment or harassment, and

6    they are a little bit different.  Both are

7    prohibited discriminatory acts under Title 7.

8    One disparate treatment simply means that

9    females are treated differently than males as a

10   general rule and that you had experienced some

11   type of disparate treatment, different treatment

12   because you were a female.  A sexual harassment

13   claim, on the other hand, is one in which there

14   is some pervasive conduct, ongoing conduct which

15   makes your job difficult.  Which one of those

16   are you claiming?

17        A.    Sexual harassment.

18        Q.    Okay.  Let me just put these

19   questions out there and if y'all need to talk,

20   we can, because I need to clear this up too.

21   There are two claims in your lawsuit.  One is a

22   1981 claim, 42 U.S.C. 1981 -- it's generally an

23   equal protection claim.  I need to know if you

1      A.      Being a female.

2      Q.      Do you have any comparators?  In

3  other words, is there anybody out there that you

4  can point to who is similarly situated to you

5  but for their gender -- in other words, they

6  were a male whereas you were a female and were

7  treated differently than you in terms of hiring,

8  firing, anything like that?

9      A.      Explain the question again.

10      Q.      Normally in a disparate treatment

11  case we have what is called comparators.  And

12  those comparators are people who are similarly

13  situated to you, in other words they usually

14  will hold a similar job, or work for the same

15  people, and then they get somehow treated

16  differently than you, and that that difference

17  is based upon your gender, in this case your

18  being a female.  So do you have anybody to which

19  you can point and say they were treated

20  differently than me because they were a man?

21      A.      I don't have anybody, but there

22  was a similar situation that happened at the

23  police department.

```
 1          Q.      Tell me about it.
 2          A.      There was a sergeant that fondled
 3   a -- a male that -- a white male that fondled a
 4   black female and he got his stripes taken and he
 5   got sent to another shift.
 6          Q.      So that's similar to what you --
 7          A.      Yes.
 8          Q.      You don't know of any males who
 9   have been mistreated who got treated
10   differently, I guess?
11          A.      No, sir.
12          Q.      Under your 1983 claim, is it also
13   your right to be treated equal, is it the same
14   right that you are alleging that's been violated
15   under 1983?
16          A.      Yes.
17          Q.      You mentioned in your complaint
18   that you were eight-and-a-half-months pregnant?
19          A.      Yes, sir.
20          Q.      Are you alleging that you were
21   terminated or treated differently because you
22   were pregnant as opposed to not being pregnant?
23          A.      Yes.
```

1     Q.    How so?

2     A.    I guess you could say I was

3  treated differently.  I was -- there was extra

4  stress.  I did -- I guess I worked a dangerous

5  post, I got.

6     Q.    Has there been anybody else that

7  you can point to who was pregnant that got

8  treated differently -- well, that's not really

9  the way I need to put it -- do you feel like you

10  were treated the way you were treated because

11  you were pregnant?

12     A.    No.

13     Q.    Has there been any pattern in your

14  opinion that you saw of the City or the jail

15  treating pregnant women differently than

16  non-pregnant women or men?

17     A.    No.

18     Q.    When did you get pregnant?  You

19  can give me a window -- you don't have to tell

20  me the exact day.

21     A.    The baby was due in February.  I

22  guess it was August -- it was August.

23     Q.    I'm thinking April or June.  If it

## MEMORANDUM

TO:        All Department Heads

FROM:     Randy Dixon
           Executive Assistant to the Mayor

DATE:      January 30, 2002

RE:        New City Harassment Policy

The City of Montgomery Personnel Department has scheduled <u>mandatory</u> meetings on the New City of Montgomery Harassment Policy. All City employees are required to attend these meetings which will be held at the Montgomery Civic Center on the dates and times listed below.

There are two (2) sessions for "Supervisor Personnel Only" which should be attended by Department Heads, Assistant Dept. Heads and Supervisory employees (those who make recommendations on promotions, anniversary raises, training or other "tangible job benefits"). The Department Heads or Supervisors that attended the January 16 meeting at the Personnel office are excluded.

It is each Department Head's responsibility to see that each employee attends, signs in and signs an acknowledgment of understanding memorandum. This memorandum will be placed in his or her personnel file. Please space employees attendance out so that you are not under staffed and that no one meeting is over crowded. If you have questions or scheduling problems please call me at 241-2005.

| <u>February 7</u> | <u>February 8</u> | <u>February 14</u> | <u>February 21</u> |
|---|---|---|---|
| 8:30 a.m. **Supervisors** | 7:30 a.m. | 9:00 a.m. | 7:30 a.m |
| 9:30 a.m. | 8:30 a.m. | 10:00 a.m. | 8:30 a.m. |
| 10:30 a.m. | 3:00 p.m. | 1:00 p.m. | 3:30 p.m. **Supervisors** |
| 1:30 p.m. | 4:00 p.m. | 2:00 p.m. | 4:30 p.m. |

/rld

DEFENDANT'S EXHIBIT
J

## CITY OF MONTGOMERY POLICY
## ON HARASSMENT IN THE WORKPLACE

It is the policy of the City of Montgomery that harassment in the workplace will not be tolerated. Department/Division Heads, supervisors, employees and third-party contractors are prohibited from engaging in verbal, physical or other conduct that harasses, disrupts or interferes with another's work performance or which creates an intimidating, offensive or hostile working environment. Harassment based on race, color, religion, sex, national origin, age, disability and any other protected status, is against the law. Violators of this policy are subject to prompt disciplinary action, including termination from employment.

## Section 1:  Implementation

Department/Division Heads and other supervisors are responsible for implementation of this policy, and they are required to

a.    Distribute a copy of this policy to all existing employees immediately and to all new employees within 10 days of their employment;

b.    Maintain a file of employees' signatures to their receipt of the policy;

c.    ensure that all current employees, newly hired employees and contractors are informed of the policy and made sensitive to harassment issues by providing training with assistance from the City Attorney's Office, the Personnel Department, and/or outside consultants.

d.    take immediate and appropriate action, including corrective action, if appropriate, to ensure compliance upon observing or being advised of words and/or actions that may violate this policy, even if no complaint has been made; and

e.    refrain from retaliating against the complainant, witnesses, and/or participants in the investigation of the complaint.

Any supervisor who receives a complaint and fails to take prompt corrective action or any supervisor who retaliates against any person mentioned herein shall be subject to disciplinary action, up to and including termination from employment.

## Section 2:  Definitions of harassment

a.    Sexual Harassment: Unwelcome sexual advances, requests for sexual favors, or verbal or physical contact of a sexual nature when any of the following occurs:

(1)    Submission to such conduct is made a term or condition of an individual's continued employment, promotion, or other condition of employment. This may occur by clearly-stated acts or words, or implied acts or words;

    (2)    Submission to or rejection of such conduct is used as a basis for employment decisions affecting an employee or job applicant; or

    (3)    Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance, or creates an intimidating, hostile, or offensive work environment.

b.    Race, Color, Religion, National Origin, Age, and Disability Harassment: Unwelcome statements, name-calling, or other offensive verbal, written, graphic, e-mail or physical conduct based upon an employee's race, color, religion, national origin, age, or disability is prohibited if or when any of the following occurs:

    (1)    Submission to such conduct is made a term or condition of an individual's continued employment, promotion, or other condition of employment;

    (2)    Submission to or rejection of such conduct is used as a basis for employment decisions affecting an employee or job applicant; or

    (3)    Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance, or creates an intimidating, hostile, or offensive work environment.

## Section 3.  Prohibited Acts of Harassment

a.    Examples of verbal and physical sexual harassment:
    (1)    sexually vulgar language;
    (2)    remarks about a person's physical anatomy;
    (3)    distribution or display of written or graphic sexual materials;
    (4)    touching another person in a sexually suggestive way; or
    (5)    positioning oneself to look at another person's breasts, genital area or buttocks.

b.    Examples of verbal and physical harassment based on race, color, religion, national origin, age and disability
    (1)    derogatory racial references: "coon", "cracker", "nigger", "redneck", "jungle bunny", etc.;
    (2)    prohibited disability references: "deaf and dumb", "cripple", "spastic", "crazy", etc.;
    (3)    demeaning national original references: "dago", "polock", "slant eyes", "jap", "spic", etc.;
    (4)    derogatory age references: "old-timer", "old fart", "old hag", "dinosaur", "mummy", etc.;
    (5)    display of signs, pictures, cartoons, written statements or other material that denigrates or discriminates against any employee(s) based on his or her race, color, religion, national origin, age or disability; or
    (6)    pushing, shoving or other intentional act or conduct perpetrated in whole, or in part, because of another's membership in a protected category.

**Section 4:   Reporting and Investigating Harassment Charges**

a.   Any employee who believes that he or she is being harassed should report it immediately in writing or verbally to his/her employer.  If the complaint is made verbally, the complainant should make and maintain a written account detailing the date of the incident(s), what was said or done, and the names of all witnesses.  The complainant shall make the report to his or her

   (1)   immediate supervisor;

   (2)   department/division head (or designee); or

   (3)   the Mayor's Office.

   (4)   Personnel Director

b.   All complaints shall be handled in a timely and confidential manner.  The department/division head or designee  will, while coordinating with one of the Mayor's Executive Assistants and the City Attorney's Office, conduct an investigation of the complaint, inform the complainant and alleged harasser of the findings, and take corrective action, as appropriate.  This process shall be completed as quickly as possible, but will generally not exceed 45 calendar days from the date of receipt of the complaint.

**Section 5:  Confidentiality**

No person is permitted to discuss the complaint, the identity of the persons complaining or witnesses, or any other facts, except as required by the investigation of the complaint, the findings, and the determination of the complaint. Employees, supervisors, and managers are subject to disciplinary action if they fail to comply with this section by unnecessarily disclosing information about the complaint.  Confidentiality is preserved to the degree possible in order to protect the privacy of the complaining employee as well as to protect the reputation of any employee who might wrongfully be accused.



This is to acknowledge that I attended the City of Montgomery's **Harassment in the Workplace** Training class at the Montgomery Civic Center and that I received a copy of Montgomery's Harassment Policy, which I have read and understand.

_Shirley D. Dean_
Signature

_02 - 08 - 2002_
Date

_Shirley D. Dean_

DEFENDANT'S
EXHIBIT
K

PER FORM 35
Revised 10/04

Certified Mail
Return Receipt Requested

Date  _05/15/06_

## NOTIFICATION OF SUSPENSION

Employee's Name _____ MJCO CALVIN W. KNIGHT _____

Street Address _____ BY HAND DELIVERY _____

City/State/Zip _____

This is to notify you that as of this date, you are herewith suspended without pay for the period of
two (2) working days    –  June 12 – 13, 2006 _____

Off days – Thursday and Friday _____

The reason(s) for this suspension is (are) (List all charges - attach additional sheets as required):

Violation of Article I, Section 1.330, Duties of Responsible Employment (Respect to Other Members and Employees) of the Manual of Rules and Regulations governing the Montgomery Police Department.

Previous record considered (List all actions considered - attach additional sheets as required):

### APPEAL RIGHTS

Suspensions in excess of 30 calendar days in any fiscal year may be appealed to the Personnel Board. Suspensions of 30 calendar days or less may not be appealed to the Personnel Board except as may be other wise provided in Personnel Rules and ] Regulations, Rule VIII, Section 12 and Rule VII, Section 12 or 13.

A permanent employee who has received a suspension appealable under Personnel Rules and Regulations may answer these charges within three (3) days from the date of receipt of the notification of suspension by responding in writing, to the Appointing Authority and providing a copy to the Personnel Director, who is located at 27 Madison Avenue.

Within ten (10) days from the time for filing your answer, if you desire a hearing before the Personnel Board you must file a written request with the Personnel Director.

Consult the Montgomery City-County Personnel Department, 27 Madison Avenue, relative to any other rights you have under the Merit System Law.

I hereby certify that this document was given to the employee or placed in the United States mail on

_S- 15-06_
month/day/year

_Bobby Bright_ _5/7/06_
Department Head/Appointing Authority

_C W  Knight_
Employee

_____
Mayor
Title

**DEFENDANT'S EXHIBIT**
L

**DEFENDANT'S EXHIBIT**

_M_

**1.3**          **MONTGOMERY POLICE DEPARTMENT**

| SUBJECT: POLICY - Conduct | ARTICLE I | SECTION: 1.305 – 1.330 |
| | | REVISED: 12/01/05 |

1.330          DUTIES OF RESPONSIBLE EMPLOYMENT:

Every member and employee is obligated to faithfully discharge his employment for so long as he is employed with the Department. This responsibility includes but is not limited to:

- Respect to superior officers

- Respect to other members and employees

- Respect toward the public

- Proper discharge of assignment

- Attention to duty

- Attention to dress

- Truthfulness at all times

- Honesty in all matters, official and private

- Prompt and accurate reporting of all official matters.

In addition to the requirements of responsible employment, there are prohibitions that are necessary to the maintenance of public confidence and trust. These prohibitions include but are not limited to:

- Engaging in criminal acts

- Engaging in the use of intoxicants while on duty or for a period of eight hours prior to reporting to normally assigned duty

- Engaging in criticism, malicious gossip, and rumor on a matter involving an individual associated with the Department

- Engaging in the conversion of lost, found, or public property for the private use of an individual

- Engaging in business transactions with suspects, defendants, or prisoners except as authorized by the Chief of Police or his designated representative

- Engaging in business which, because of his employment, may reflect negatively on the interest of the Department or the individual member or employee

**1.3**               **MONTGOMERY POLICE DEPARTMENT**

| | | |
|---|---|---|
| SUBJECT: POLICY - Conduct | ARTICLE I | SECTION: 1.305 – 1.330 |
| | | REVISED: 12/01/05 |

- Engaging in any activity which may reflect negatively on the integrity, competency, or ability of the individual to perform his duty, or may reflect negatively on the reputation of the Department

- Engaging in any act that a reasonable person would view as an obstruction of justice

- Engaging in soliciting a reward or gratuity for a service rendered in the line of duty.

1   gave to her?

2       A.     In Internal Affairs?

3       Q.     Yes, ma'am.

4       A.     To answer the Internal Affairs

5   questions -- it's not an option.

6       Q.     Did she tell you I will be happy

7   to answer these questions if you will just let

8   me go call my attorney, or I need to find out

9   what's going on here?

10       A.     Not at first she didn't.  She told

11   me she would not answer the questions.  I told

12   her that it was not an option, that you had to

13   answer the questions.  She said I'm not

14   answering any questions without my attorney.

15   And I said I'm giving you a direct order to

16   answer the questions.  And she said you can give

17   me a direct order if you want to, but I'm not

18   answering the questions.

19       Q.     Did she know why she was there?

20       A.     I don't think she did.  I mean, I

21   don't think it was that far into the

22   investigation that she knew.  I don't think she

23   did.



DEFENDANT'S
EXHIBIT
tabbies
N

1        Q.      At some point did she get moved to
2    third shift?

3        A.      She did.

4        Q.      What was the reason for that?

5        A.      It was to take her out of the
6    environment that she was working in.

7        Q.      And what prompted that move?  In
8    other words, what point was it brought to -- and
9    you may not know, it may be somebody else that
10   handled that.

11       A.      It was after the incident with
12   Knight, you know -- we felt like she needed to
13   be taken out of the environment, and that's what
14   was done.  And I think she was asked, you know,
15   how she liked third shift or was she okay, and
16   then I think at some point she was brought back
17   to second shift.

18       Q.      Okay.

19              MR. MILLS:  That's all.

20

21   EXAMINATION BY MRS. DICKEY:

22       Q.      I found the transcript on the
23   incident where Mrs. Dean was alleged to have

(SEARCH OF PRISONERS)

Every new prisoner must be given a thorough search to make certain that he/she has no weapons on this person. This is the first and most important step in processing the prisoner. It will be done even though it has already been accomplished by the arresting officer. It's on video camera.

All cash and personal property will be removed from the prisoner's possession and given to the desk correctional officer for control and placement in the Property Envelope. Expensive valuables such as jewelry or large amounts of cash are to be impounded in the Supply and Evidence room or at the rear desk. Inmates are allowed to keep up to $35.00 cash on them.

(INMATE SEARCHES)

All inmates housed in the Montgomery City Jail are subject to search at any time. All inmate searches will be conducted by a correctional officer, police personnel, or medical personnel at the discretion of the shift supervisor.

A.   Frisk Search

1.   Frisk searches may be conducted by MJCO's at any time that the officer believes the inmate may have contraband.

2.   Frisk searches will be conducted on all inmates entering the jail.

3.   Only female MJCO's will frisk female inmates. Male MJCO's may only search female inmates under emergency circumstances and not by themselves.

4.   If an MJCO of the same sex is not available, a police officer of the same sex will be obtained.

5.   This procedure will be in effect unless exigent circumstances prevail.

B.   Strip Search

1.   Strip searches may be conducted on any inmate at any time by MJCO of the same sex with a witness.

2.   All felonies and/or drug related inmates will be strip searched prior to being placed in the inmate housing area.

3.   Strip searches will be conducted by MJCO's of the same sex as the inmate.

24


DEFENDANT'S EXHIBIT

'exhibitsticker'

4. Strip searches will be conducted in private with two officers of the same sex.

5. If a MJCO of the same sex as the inmate is not available, a police officer of the same sex will be requested to do the search.

6. Searching officers should not touch the inmate during strip searches.

7. This procedure will be in effect unless exigent circumstances prevail.

C. <u>Body Cavity Searches</u>

1. Body cavity searches are considered anal and vaginal.

2. Body cavity searches will be preformed only by medical personnel.

3. Body cavity searches will be conducted under medical conditions.

4. If, in the opinion of the medical personnel, a safe body cavity examination cannot be conducted in the jail under the conditions present and considering the inmate's condition, the inmate will be transported to the emergency room and the search performed by emergency room personnel.

5. Immediately following all body cavity searches, a complete report will be forwarded to the Warden's office.

6. All body cavity searches will be performed in private.


(JUVENILES)

Under no circumstances will a juvenile (a person under 18 years of age) be placed in the Municipal Jail unless so ordered by the court. The Juvenile Division will process all offenses committed by juveniles under 18 years of age. This does not apply to traffic cases. If for any reason a juvenile is housed in the Municipal Jail, he/she will be housed separate from adult inmates.

(BOOKING)

BOOKING PROCEDURE

1. Sign on system
2. Type 1, work with booking
3. Pres F6, add booking

# MONTGOMERY MUNICIPAL JAIL

## POLICY AND PROCEDURES

**SUBJECT:**            SEARCHES

**NUMBER:**            2.80

**EFFECTIVE DATE:**   FEBRUARY 13, 2005

**PURPOSE:**            The purpose of this policy is to provide guidelines for searches
within the confinement of the Municipal Jail. The need for
searches of inmates is security: prevention of contraband from
entering or circulating within the jail.

**DEFINITION:**
1. Blanket search policy – requires searching all arrestees booked into the jail. (Skurstensis
v. Jones, 81 F.Supp.2d 1228 (N.D. Ala., 1999).

2. Reasonable suspicion – requires only specific objective facts upon which a prudent
official, in light of his experience, would conclude that illicit activity might be in progress.
*Spear v. sowders, 71 F.3d, 631 (7th Cir. 1995)*. It is a judgment call on the part of some jail
official preferably a supervisor.

**APPLICATION:**

1. CELL SEARCHES – Inmates have no reasonable expectation of privacy in their cells and,
therefore, no Fourth Amendment protections in regard to cell searches. Furthermore,
inmates have no right to be present while their cells are searched. Sound correctional
practices expect officer to treat inmate property with some respect. Cells should not be
trashed.

2. PAT SEARCHES – Arrestees and inmates shall receive pat searches. Pat searches shall
be conducted professionally. Female officers may pat search male inmates/arrestees, but
there is no case laws protection where male officers pat searching female
inmates/arrestees is acceptable. Male officers' pat searching female inmates/arrestees
remains potentially problematic.

3. STRIP SEARCHES – An arrestee can only be strip searched where *reasonable suspicion*
exist to justify the search. Reasonable suspicion can be based upon the behavior of the
individual and also upon the charges on which the arrest is based. Any time an arrestee is
required to expose their private parts to a jail staff member as part of the booking and
admission process he/she is being strip searched.
All inmates can be strip searched any time they return from a contact visit or other
excursion out of the secure perimeter of the facility (medical visits, court, etc.). There is
almost no case law that addresses whether inmates can be randomly strip searched.

Strip searches should normally be performed by persons of the same sex as the arrestee/inmate, and strip searches should normally be done in a place that is not observable by other persons not directly involved in conducting the search.

CONCLUSION – The general rule is persons entering the jail incident to an arrest may be strip searched *only when reasonable suspicion exists* that the person is concealing contraband or weapons. A policy of strip searching all arrestees, regardless of the existence of reasonable suspicion, is unconstitutional.


Drafted by _____
            W.R. Collins
Reviewed by _____

Reviewed by _____

1  City in any way motivate you to retaliate

2  against her or move her as a form of punishment?

3      A.    No, because I'm the one that gave

4  Mrs. Brantley the authorization to contact her

5  if she wanted to come back, to put it in writing

6  if she wanted to come back.  She wrote me saying

7  she wanted to come back to the second shift, and

8  it was never questioned.  It wasn't like you

9  stay there -- it was come on back.  It was her

10  choice to go, and her choice to stay -- to come

11  back.  Because when she was on leave the letter

12  was sent out so when she come back she would

13  have time to adjust her schedule and all of that

14  and prepare.  If she was not going to accept it,

15  she had the opportunity to come in and stay on

16  the second shift.  Then I would have made

17  another decision, whatever that would have

18  been.

19      Q.    Warden Collins, you mentioned a

20  rule on stripsearches.  Tell me what the rule is

21  on that.

22      A.    Well, it's the law.  The law

23  states that males and females can work in a



DEFENDANT'S
EXHIBIT
P

```
1    correction environment, but males and females
2    can't cross-gender search.  Now the second shift
3    is the most widely active shift of all three
4    shifts because we have like 30-40 people coming
5    in from the outside work details, we have food
6    service people to be stripped -- they are all
7    males -- so we need males on that shift to
8    fulfill the law.  If not, we allow contraband to
9    come in and then there is a life-threatening
10   situation.  So that was all taken into
11   consideration when I asked her to go to the
12   third shift instead of sending him.
13        Q.    So did you need Knight on that
14   second shift?  What would have happened had you
15   not had Knight on that second shift at that
16   time?
17        A.    I don't know.  We would have had
18   major problems.  Because with the number of male
19   prisoners that we have to process, as an
20   administrator it was my concern to not allow
21   this contraband to come in from the streets,
22   that would have put us at a disadvantage.  That
23   was the only reason that I asked her instead of
```

1    How many people do you have on that level?

2            A.      On a shift you mean?

3            Q.      Right.

4            A.      At that time we had about 12.  And

5    I don't remember the exact number, exactly what

6    it was at that time, because at the same time I

7    had a BFOQ to hire more males since we had a

8    shortage.

9            Q.      Does that mean that you requested

10   from the City to hire -- in other words to

11   discriminate and hire males specifically over

12   females?

13           A.      Basically, yes, and that was the

14   case I took to the Personnel Board and they

15   approved it based on that law, and the need.

16   And that's what we was in the process of doing

17   even now, up until -- well, we stopped it when

18   we got the comparable.

19           Q.      What is your average ratio of

20   male-to-female inmates?  In other words how

21   many?

22           A.      To give you an example -- we have

23   396 inmates over there now and 24 to 30 is

1    that might have been able to swap with Knight?

2        A.    We are short males on the first

3    shift, we still are -- short of males -- first

4    and second shift need the most males.  Moving

5    Mr. Knight to the first shift wouldn't have made

6    no difference than probably just moving him from

7    one spot to the other.  The third shift was the

8    shift that needed the -- we had the shortest

9    staff.  We had one lady out on long-term

10    military leave, and the other reasons.  The

11    third shift was the only shift that was

12    available in my decision for anyone to be moved

13    to, because there wasn't no need to fill up the

14    first shift and then third shift is still short.

15        Q.    And you don't think there was a

16    male on third shift that could have just swapped

17    with Mr. Knight.

18        A.    No one volunteered.  I could have

19    ordered them to, if I thought it was feasible.

20        Q.    Okay.

21             MRS. DICKEY:  I have no other

22    questions.

23             MR. MILLS:  That's all.

1    earlier.  I had talked to Mrs. Dean on more than

2    one occasion about going to third shift, because

3    of her conflict with the supervisors, because

4    she had numerous run-ins with supervisors not

5    following orders.  And when this came to pass, I

6    asked her would she volunteer to go to the third

7    shift.  She said she would think about it.  She

8    called me back and said that she would go and

9    that was a done deal.  So I sent that letter as

10   a formal notation that she was going to third

11   shift, and also to let her if she had any

12   problems to contact me, which she did.  Later

13   on, as you probably got over there, she called

14   me and said she changed her mind -- or she told

15   Ms. Brantley that I'm sure in a letter.  So that

16   was -- getting back to my reason -- that was my

17   reason why I recommended that she go to third

18   shift -- I had recommended that earlier before

19   the incident even came to the conclusion.

20          Q.    Is there a reason why you didn't

21   put that reason in the letter?  You didn't say

22   in this letter we're moving you because, or this

23   is to follow up our telephone conversation, we

# City of Montgomery Progressive Discipline Policy

## Introduction

When it is determined that an employee is not fulfilling the responsibilities of the position to which he or she is assigned, all reasonable counseling and disciplinary steps should be taken prior to discharge. In order to determine objectively that the employee has been given an opportunity to correct a deficiency, the following policy has been written.

**This policy is designed to address deficient job performance including unsatisfactory work habits and it does not apply when an employee commits an infraction that warrants immediate dismissal such as theft of city property, assault on another employee, using city time or property for personal gain and any number of other serious infractions. This list of serious infractions is not intended to be all inclusive.**

## Policy Guideline

### Probationary Employees

A new employee of probationary status whose performance is not satisfactory should be terminated if he or she fails to demonstrate ability or desire to perform at an acceptable level. Notification of Rejection of Probationary Appointment/Promotion (Form 38) should be completed, provided to the employee and forwarded to the Mayor's Office and Personnel.

### Nonprobationary Employees

Disciplinary situations involving employees who have completed their probationary period should be dealt with by progressive discipline. Consistently applied progressive discipline will assure equitable treatment and encourage acceptable performance.

Three steps are suggested in the discipline procedure. Discharge is recommended only when the employee does not respond to these steps:

### Step 1: Informal Discussion or verbal warning

When a performance problem is first identified, the problem should be thoroughly discussed with the employee. Bringing the problem to the attention of the employee is often enough to prompt him or her to correct it willingly.

### Step 2: Counseling

If a private informal discussion with the employee has not resulted in corrective action, following a thorough investigation, the supervisor should meet with the employee and: (a) review the problem, (b) permit the employee to present his or her views on the problem, (c) advise the employee that the problem must be corrected, (d) inform the employee that failure to correct the problem will result in further disciplinary action

DEFENDANT'S
EXHIBIT
Q

**Procedure**

Supervisors and Department Heads are responsible for the consistent application of discipline to all employees within a department according to the above policy. It is understood that certain infractions are more consequential in some departments than others. For example, a tardy in one department may result in one employee starting to work late whereas a tardy in another department may result in an entire work crew starting to work late.

The Department Head is responsible for the distributing this policy to all employees and ensuring that the employee understands the policy and what is expected of the employee.